UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

                           Plaintiff,

          -against-

JEFF BEIBEN, MARK PURIFICATI, FARI
GUTIERREZ, CHRISTIAN HOGARTH, TIFFANY
URIBE, DAVID SEGOVIA, and DIRECT IME
SERVICES LLC,

                           Defendants.
---------------------------------------------------------------X

**Case No.: 1:25-cv-10218**

**<u>COMPLAINT</u>**

Plaintiff IME WatchDog, Inc. ("IME WatchDog"), by its attorneys Sage Legal LLC and

Milman Labuda Law Group PLLC, as and for its Complaint against Defendants Jeff Beiben

("Beiben"), Mark Purificati ("Purificati"), Fari Gutierrez ("Gutierrez"), Christian Hogarth

("Hogarth"), Tiffany Uribe ("Uribe"), David Segovia ("Segovia") (Beiben, Purificati, Gutierrez,

Hogarth, Uribe, and Segovia collectively hereinafter the "Individual Defendants"), and Direct

IME Services LLC ("Direct IME") (the Individual Defendants and Direct IME collectively

hereinafter the "Defendants"), hereby alleges as follows:

## <u>NATURE OF THE CASE</u>

1.     This is an action for damages and injunctive relief related to Defendants'

misappropriation, use of, and profit from Plaintiff's confidential information and trade secrets

resulting in Defendants': (i) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836

("DTSA"); (ii) misappropriation of trade secrets under New York common law; (iii) unfair

competition under New York common law; (iv) unjust enrichment; (v) civil conspiracy; and (vii)

conversion.

2.      Defendants' diabolical scheme to leech off of Plaintiff's business, causing Plaintiff's substantial financial losses, must be stopped.

3.      In addition, Defendants must pay damages for the harm they have caused to Plaintiff's business.

## PARTIES

4.      IME WatchDog was at all times relevant and remains a corporation duly incorporated under the laws of the State of New York with its principal place of business in Queens County, New York.

5.      Daniella Levi, Esq. is its sole shareholder & Chief Executive Officer.

6.      Upon information and belief, the individual Defendants are each residents of the State of New York.

7.      Upon information and belief, Defendant Direct IME LLC is a Florida limited liability company organized on June 11, 2025 with a principal place of business at 1733 Woodlark Way, Winter Garden, FL 34787.

8.      Defendant Purificati is the registered agent for Direct IME.

9.      As set forth herein, the Defendants knew that the businesses they are employed by and/or provide services for were built on stolen trade secrets by non-parties Safa Abdulrahman Gelardi ("Safa") and Vito Gelardi ("Vito"),[1] who engaged in illegal conduct related to their foray into the IME observer business and each of the Defendants willingly, voluntarily, and knowingly joined in Safa's and Vito's wrongful conduct.

---

[1] These individuals are Defendants in IME WatchDog, Inc. v. Gelardi, et al.; Case No.: 1:22-cv-1032 (PKC) (JRC) (E.D.N.Y.) (hereinafter the "Gelardi Case"), and have been enjoined from unlawfully competing with Plaintiff, as the Defendants in this case should be.

10.     Plaintiff has obtained substantial injunctive relief and contempt awards against Safa and Vito, together with any persons or entities acting in concert with or on behalf of them, in the Gelardi Case in the United States District Court for the Eastern District of New York before the Hon. Pamela K. Chen, U.S.D.J. ("Judge Chen") wherein that court there repeatedly found that Plaintiff has established a strong likelihood of success on its claims against Safa, Vito, and IME Companions LLC ("Companions"), the business Safa and Vito formed once they stole Plaintiff's trade secrets and other related businesses Safa and Vito created in attempts to thwart orders enjoining them.

11.     On March 10, 2023, the Court in the Gelardi Case enjoined "[the Gelardis, Companions] and any persons/entities acting in concert with them" from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." See Gelardi Case, ECF Docket Entry 156.

12.     As part of the relief granted in the Gelardi Case, Judge Chen enjoined the Gelardis, Companions, and any persons/entities acting in concert with them from serving certain identified customers who Plaintiff was able to show the Gelardis and Companions obtained through improper means, which customers are identified in the Enjoined Customers List ("ECL").

13.     Following the entry of the preliminary injunction, Gutierrez, at Safa's directive, created Client Exam Services LLC ("CES") to circumvent the Court's TRO in the Gelardi case. See IME Watchdog, Inc. v. Gelardi, 732 F. Supp. 3d 224 (E.D.N.Y. 2024).

14.     Beiben operated CES and attended approximately and at least twelve (12) IMEs on behalf of CES for the same clients he had been serving when he worked at Companions after the March 2023 TRO was issued. *Id.*

15.     After Plaintiff learned about CES, Safa utilized a New York City police officer, Eugene Liddie ("Liddie" or "Liddy"), to start another business for Safa called IME Legal Reps, which was also operated by Beiben.  See Gelardi Case, ECF Docket Entry 448.

16.     IME Legal Reps utilized the same observers that IME Companions utilized, including all of the Individual Defendants.

17.     IME Legal Reps provided services to customers on the ECL.

18.     After Plaintiff learned about IME Legal Reps, and enjoined Liddie and IME Legal Reps from serving customers on the ECL, the Gelardis and Companions utilized Defendant Purificati to open a new business, Direct IME, as part of their tried and true continued pattern and practice of engaging in efforts to evade Judge Chen's preliminary injunctions.

19.     Direct IME utilizes the same observers that were utilized by Companions and its other alter ego entities.

20.     Direct IME provides services to customers on the ECL.

21.     For example, (i) on April 24, 2025, plaintiff Quiana Woodbury (Index No. 506527/2024), represented by Law Offices of Zemsky and Salomon, P.C. ("Zemsky"), a client on the ECL, attended an IME with Dr. Dorothy Scarpinato located at 277 88th Street Brooklyn, NY, where Purificati from Direct IME was the observer; (ii) on May 28, 2025, plaintiff Emily Persaud, (Index No. 815982/2024E), also represented by Zemsky, attended an IME with Dr. William Walsh located at 3713 East Tremont Avenue, Bronx, NY, where Purificati from Direct IME was the observer; and (iii) on June 5, 2025, plaintiff Maria Alfaro Nunez, (Index No. 603853/2020), represented by Bergman Bergman Fields & Lamonsoff, LLP, a client on the ECL, attended an IME with Dr. Jeffrey Richmond located at 600 Northern Boulevard, Suite 300, Great Neck, NY, where Uribe from Direct IME was the observer.

22.    Upon information and belief, the individual defendants observed additional IMEs for clients on the ECL on behalf of Direct IME despite Direct IME' name not being included on the IME report.

23.    Discovery obtained and evidence adduced at hearings in the Gelardi Case has demonstrated that the Defendants in this case continue to benefit and profit from Plaintiff's stolen and misappropriated trade secrets.

24.    Defendants know their conduct is wrong, and – as such – the Individual Defendants have refused to respond to subpoenas served on them in the Gelardi Case, despite repeated Court Orders to do so.  See Gelardi Case, October 18, 2024, April 16, 2024, October 18, 2024, January 7, 2025, March 24, 2025 ECF Docket Entries.

25.    Defendants knew about the injunctions issued by Judge Chen in the Gelardi Case prohibiting Safa, Vito, and Companions, together with any persons or entities acting in concert with or on behalf of them, from serving clients of IME WatchDog which were on the ECL, yet they have chosen to violate Judge Chen's injunctions and orders.

26.    Plaintiff is thus forced to seek relief against the Defendants for their unabated and shamefully willful continued use of Plaintiff's trade secrets.

## JURISDICTION AND VENUE

27.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 given that Plaintiff pursues claims under the DTSA, a federal law.

28.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims against Defendants because they are part of the same case or controversy and arise under a common nucleus of operative facts.

29.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district as, through the use of Plaintiff's trade secrets, Defendants have appeared for IMEs in this District and solicited business from customers on the ECL in this District.

## FACTS

### IME Watchdog's Business

30.     Daniella Levi, Esq. ("Mrs. Levi") is a personal injury attorney who is the President of Daniella Levi & Associates, P.C., a personal injury law firm representing injured plaintiffs.

31.     Since 2002, Mrs. Levi dealt with the dreaded so-called independent medical examination ("IME") of her clients.

32.     Throughout the first decade of her practice in the personal injury field, Mrs. Levi was often frustrated by insurance carriers' use of IMEs to prevail in cases.

33.     In fact, she refers to IMEs as "insurance medical exams," conducted by doctors hired by the insurance companies and, therefore, they are anything but "independent."

34.     Mrs. Levi's injured clients had to attend those IMEs and would report to her thereafter that the so-called examination generally lasted for only a few minutes; those short exams generally produced voluminous reports detailing how either Mrs. Levi's clients' injuries were not causally related to the accident, or that they completely healed.

35.     The defendants in personal injury lawsuits, by and through their insurance carriers and defense counsel, use these IME reports in support of motions for summary judgment or at the time of trial.

36.     Since the IME exam is an integral part of the litigation and an adversarial event, Mrs. Levi always felt that it was important that clients not attend them unaccompanied.

37.    However, the reality was that on an industry-wide basis, it was almost always the case that clients attended IMEs alone, for a couple of reasons.

38.    First, it was too expensive and disruptive to law practices to have a paralegal and/or attorney out of the office for, sometimes, hours at a time.

39.    Second, there was a risk that, if an attorney who attended the IME with his or her client had to testify at trial about what truly transpired, any such attorney would be disqualified on the basis of being a fact witness pursuant to Rule 3.7 of the New York Rules of Professional Conduct.

40.    Mrs. Levi therefore saw a real need for a service that could fulfill this very important function at an economically feasible price point.

41.    After much thoughtful deliberation, in or about May 2011, Mrs. Levi decided to pull the trigger on her idea and launch IME WatchDog, Inc.

42.    The business idea was to provide "watch dogs" to personal injury law firms that would accompany personal injury law firm clients to IMEs and report back about what did and did not occur during those IMEs.

43.    Mrs. Levi came up with the concept, developed forms of reports for the "watch dogs" to complete relating to the different types of IMEs (i.e., orthopedic, neurological, chiropractic, and other modalities), established price lists, established recruitment and training procedures for the watch dogs, and started the IME observer ("watch dog") business from scratch.

44.    Mrs. Levi built a customer database through her long-lasting relationships and friendships with other personal injury attorneys who she frequently interacted with in court, through memberships in different legal organization such as New York State Trial Lawyers Association, American Association for Justice, various bar associations, and related list services.

45.     These relationships took Mrs. Levi years to build and it took time for IME WatchDog to grow as a business and achieve the success and reputation it has today.

46.     The documents and checklists Mrs. Levi created that are used by IME WatchDog's IME observers are confidential and proprietary, and took great costs and efforts to create.

47.     In its infancy, IME WatchDog came under attack by the insurance industry who tried in various ways to keep the "watch dogs" out of the exam room.

48.     The insurance industry acted to do so by, *inter alia*, including language in their IME notices specifically prohibiting the use of IME WatchDog, cancelling IME appointments if a client was accompanied by a watch dog, filing motions to exclude watch dogs from the exam room, and seeking to preclude watch dogs from being able to testify at trial.

49.     Mrs. Levi went through painstaking efforts, time, and money in the form of legal fees to fight the insurance carriers to make it the law of the land in the Appellate Divisions of the State of New York that "watch dogs" and observers are permitted to accompany plaintiffs to IMEs.

50.     This included, *inter alia*, suing Baker, McEvoy, Morrissey & Moskovits, P.C. ("Baker McEvoy") to enjoin them from refusing to move forward with IMEs with a "watch dog" or observer present.

51.     Ultimately, IME WatchDog prevailed in obtaining a temporary restraining Order, and subsequently litigated its case through appeal against Baker McEvoy.

52.     The Hon. James E. D'Auguste, J.S.C. succinctly summarized IME WatchDog's legal battle in a 2016 decision:

> The [conditions, inter alia, that no non-attorney may be present, placed] in Baker McEvoy's IME demand have become such a widespread problem that the law firm has been barred from serving IME notices containing conditions that purport to exclude a non-attorney representative present at the examination—exactly what has been protested in the instant case—in a plenary action. See IME Watchdog, Inc. v. Baker, McEvoy, Morrissey & Moskovitz, P.C., Index No.: 21822/2016E, NYLJ 1202756064297 (Sup.Ct., Bronx County Apr. 19, 2016) (granting [Plaintiff] a temporary restraining order and preliminary injunction against Baker McEvoy).
>
> On appeal, the Appellate Division, First Department, which had originally stayed the enforcement of an injunction, vacated the stay and permitted the injunction to go into effect. See IME Watchdog, Inc. v. Baker, McEvoy, Morrissey & Moskovitz, P.C., 2016 WL 4133495 (1st Dept. Aug. 4, 2016).
>
> Thus, Baker McEvoy is also prohibited under this separate order from the Appellate Division from the exact conduct that is the subject of the instant motion practice. Although the Appellate Division decision in IME Watchdog was issued in August, Baker McEvoy never communicated with this Court that it is not permitted to interfere with a non-attorney's presence at a physical examination.

See Steinbok v. City of New York, 53 Misc. 3d 1205(A) (Sup. Ct. N.Y. Cty. 2016).

53.     Thereafter, in Henderson v. Ross, the Second Department held that a plaintiff is entitled to be examined [at his or her IME] in the presence of his or her attorney or other legal representative, if necessary, so long as they do not interfere with the conduct of the examination. See 147 A.D.3d 915 (1st Dept. 2017).

54.     In Martinez v. Pinard, the First Department similarly held as much.  See 160 A.D.3d 440 (1st Dept. 2018); see also Santana v. Johnson, 154 A.D.3d 452 (1st Dept. 2017).

55.     As set forth by the First Department in Markel v. Pure Power Boot Camp, Inc., "IME observers or 'watchdogs' are typically hired by plaintiff's lawyers to assist their clients in filling out forms at the examining doctor's office. See 171 A.D.3d 28, 30-32 (1st Dept. 2019).

56.    More importantly, according to plaintiff, the presence of an IME observer deters examining doctors hired by defendants from inquiring about matters beyond the scope of the particular action[,] keeps the IME process honest[,] and to serve as the attorney's 'eyes and ears' [to observe] what occurred during the IME, and then [report] that information back to plaintiff's attorney." Id.

57.    Indeed, in Markel, the First Department held that an IME observer's notes constitute materials prepared for trial, bringing them within the conditional or qualified privilege protections of New York Civil Practice Law & Rules ("CPLR") § 3101(d)(2), which materials may be obtained only upon a showing that the requesting party has a substantial need for them in the preparation of its case and that, without undue hardship, the requesting party is unable to obtain the substantial equivalent by other means.  See Markel, 171 A.D.3d at 31.

58.    After costly legal battles to successfully fight for its right to exist, IME WatchDog has spent over a decade marketing its services and cultivating relationships with its customers, many of whom were customers of IME WatchDog from its inception.

59.    IME WatchDog's carefully curated customer preferences and customer relations are vital to its business; possession of that decades-long developed information provides IME WatchDog a unique competitive advantage in the IME observer industry.

60.    Since 2011 when it was formed, IME WatchDog employed Adam Rosenblatt ("Rosenblatt") initially as an administrative assistant, and then as a watch dog himself.

61.    In or about 2016, Rosenblatt became President of IME WatchDog.

62.    As President, Rosenblatt had access to IME WatchDog's entire database, including the identity of all of its customers and clients, their contact information, their preferences, pricing information, and all of the financial details of IME WatchDog.

63.    The only other individual who has access to this information is Mrs. Levi, the CEO.

64.    IME WatchDog took reasonable measures to keep this information secret, including restricting access of its database that contains this information only to Mrs. Levi and Rosenblatt, who are in managerial positions and who are required to maintain confidentiality of the documents.

65.    This information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means from others who could otherwise obtain economic value from the disclosure or use of the information.

66.    This information is related to services used in and intended for use in interstate or foreign commerce because IME WatchDog has its observers travel out of the State of New York to the States of New Jersey and Pennsylvania in the regular course of its business.

67.    Rosenblatt was in a position of trust at IME WatchDog and was required, as President of IME WatchDog, to provide his utmost duty of loyalty to his employer, IME WatchDog.

**Safa and Vito Misappropriate Plaintiff's Trade Secrets and Confidential Information**

68.    On or about January 28, 2022, Mrs. Levi received a text message from an unknown number asking to meet with her to discuss the decline in revenues of IME WatchDog.

69.    Mrs. Levi, along with her son, met this individual on February 2, 2022, and he identified himself as Carlos Roa ("Roa"), an employee of Companions.

70.    During their meeting, Mrs. Levi was presented with compelling documentary evidence that Rosenblatt had been selling information related to Plaintiff's customers and related financial information of IME WatchDog to Companions since in or about June or July of 2016.

71.    These acts were in violation of Rosenblatt's fiduciary duty, and Defendants' actions constitute, among other things, theft of trade secrets and unfair competition.

72.    Moreover, Safa and Vito knew and had reason to know that the trade secrets and confidential information they obtained from Rosenblatt – including customer lists, financial information, and details about customers – were acquired by improper means.

73.    In fact, Safa and Vito bribed Rosenblatt with money in exchange for him providing them with IME WatchDog's trade secrets (through Zelle payments, cash payments, and wire transfers), which included customer lists, financial information, and details about customers.

74.    The unauthorized disclosure by Rosenblatt of IME WatchDog's customer lists, financial data, and information to Safa and Vito provided critical information to a competitor entity that would have no other way to obtain such information and was used as "roadmap" and "step by step manual" for Companions to establish its operations.

75.    Plaintiff's trade secrets and confidential information that Rosenblatt gave to Companions provided them with the ability to duplicate operational, service, and development techniques that IME WatchDog has spent years, and even a decade, establishing.

76.    Meanwhile, Safa and Vito gained access to information that they would have no other way of obtaining and provided that information to the Defendants.

77.    Safa and Vito obtained and misappropriated such confidential and trade secret information by engaging in bribery.

78.    No permission was given to Rosenblatt to sell customer lists, financial information, and details about IME WatchDog's customers to anyone.

79.    No permission was given to Defendants to have access to any of Plaintiff's customer lists, financial information, and details about IME WatchDog's customers.

80.    Discovery, which included a forensic examination, and evidence adduced at hearings in the Gelardi Case, has indisputably established that Safa and Vito stole Plaintiff's trade secrets.

81.    A significant number of customers were targeted, solicited, and stolen by Defendants using Plaintiff's trade secrets and confidential information inappropriately and illegally acquired by Safa and Vito.

82.    After Judge Chen temporarily restrained Companions from operating their business pending an April 4, 2023 hearing on Plaintiff's renewed motion for injunctive relief, Safa and Vito formed CES to serve as an alter ego and/or successor of Companions in an effort to end-run the Judge Chen's Orders.

83.    After Judge Chen preliminarily enjoined Companions and CES from operating their business, Safa and Vito formed and/or were involved behind the scenes in forming and operating Accompanied Exam Services, IME Management & Consulting LLC, the IME Company, IME Legal Reps, and Direct IME to serve as alter egos and/or successors of Companions in an effort to end-run Judge Chen's Orders.

**Defendants Perform Services for Safa and Vito Utilizing IME Watchdog's Trade Secrets and Confidential Information**

84.    The Defendants are employed by and/or perform IME observer services for Safa and Vito through Companions, CES, Accompanied Exam Services, IME Management & Consulting LLC, the IME Company, IME Legal Rep, and Direct IME.

85.    The Individual Defendants' work for each of the foregoing companies constitutes a mere continuation of the work they performed for Safa and Vito through Companions.

86.    More importantly, the Individual Defendants gained access to the confidential information and trade secrets stolen by the Gelardis at Companions by virtue of the services they performed for the Gelardis at Companions.

87.    Each of the foregoing companies created after Companions was enjoined from serving customers on the ECL are an alter ego of Companions.  See Gelardi Case, ECF Docket Entry 448 at 40.

88.    Defendants used Plaintiff's trade secrets, including the customer lists, financial information, and details about Plaintiff's customers that Defendants knew Safa and Vito misappropriated from Plaintiff.

89.    Defendants used Plaintiff's trade secrets that Defendants knew Safa and Vito misappropriated from Plaintiff during the course of Defendants performing services for Safa and Vito and their various corporate entities

90.    The IMEs that Defendants observed for Safa and Vito and their various corporate entities on behalf of plaintiff personal injury law firms, were obtained through Safa's and Vito's misappropriation of Plaintiff's trade secrets about which Defendants were aware.

91.    Immediate injunctive relief and a permanent injunction is necessary to prevent Defendants from continuing to benefit from stolen trade secrets, destroying the customer relationships and goodwill that IME WatchDog has spent well over a decade building, and causing further imminent and irreparable financial harm to IME WatchDog.

92.    In addition to securing the return of its misappropriated information to it by Defendants and enjoining them from engaging in any further illegal activity, it is essential that IME WatchDog be permitted to forensically examine the Defendants' email accounts, computers, cellular phones, and any other electronic devices or cloud storage accounts, to determine the exact

nature and extent of Defendants' misappropriation of Plaintiff's trade secrets and confidential information.

### AS AND FOR ITS FIRST CAUSE OF ACTION
**(Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 – All Defendants)**

93.     IME WatchDog incorporates by reference each of the foregoing allegations as though fully set forth herein.

94.     Defendants' actions, as set forth herein, constitute misappropriation under the DTSA, 18 U.S.C. § 1836.

95.     Through their performance of work and services for Safa and Vito and their various corporate entities, Defendants have used trade secrets and confidential information belonging to Plaintiff, including the identity of all of its customers, contact information, and all details related to customers, including *inter alia*, their preferences and pricing, in addition to private and confidential financial information, as well as Plaintiff's forms and checklists that its observers use at IMEs.

96.     IME WatchDog made and makes reasonable efforts to maintain the secrecy of this information including limiting its disclosure to Rosenblatt, the President of IME WatchDog, and Mrs. Levi, who are entrusted to act in the best interests of IME WatchDog.

97.      Safa and Vito were prohibited by law and repeated Court Orders from continuing to possess, benefit from, and make a profit using the confidential information and trade secrets of IME WatchDog;  they failed to comply and provided this information to the Defendants to use despite repeatedly being found in contempt by Judge Chen in the Gelardi Case.

98.     The trade secret information belonging to Plaintiff that Defendants possess derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain

economic value from the disclosure or use of the information.

99.    Indeed, Defendants utilized this very information as a road map to continue operating competing businesses that have unfairly competed against IME WatchDog in dastardly fashion in continued violation of Judge Chen's Orders.

100.    Defendants knew that this information contained trade secrets belonging to IME WatchDog.

101.    Defendants have no right to retain or use any of IME WatchDog's trade secrets or other confidential and proprietary information due to their illegal conduct.

102.    Upon information and belief, Defendants are retaining and using that information to compete with IME WatchDog.

103.    IME WatchDog did not consent to Defendants' use of the information as set forth above.

104.    At all relevant times, Defendants knew that the information provided to them by Safa and Vito contains Plaintiff's proprietary trade secrets that they had no right to receive and could not receive absent the improper acts of Rosenblatt.

105.    Defendants' conduct thus constitutes knowing, willful, malicious use, and misappropriation.

106.    The New York customers for whom the IMEs were performed by Defendants were obtained through interstate solicitations by Safa in Texas and scheduled by Safa in Texas, and the observers were paid by Safa and Vito by the transfer of monies from Texas to New York.

107.    Defendants have wrongfully acquired and used Plaintiff's trade secrets and continue to do so, without the express or implied consent of Plaintiff, for Defendants' own benefit and the benefit of others.

108.    The public policy in favor of protecting Plaintiff's interest in maintaining its trade secrets outweighs any interest Defendants could have in using Plaintiffs' trade secrets.

109.    As a direct and proximate result of Defendants' misappropriation and use of Plaintiff's trade secrets, Plaintiff has suffered and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation and use of its trade secrets and loss of its brand recognition and goodwill with its clients, and will continue to suffer said injury, loss, harm or damage unless and until Defendants are restrained from their continued misappropriation of trade secrets.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Injunctive Relief under the DTSA (18 U.S.C. § 1836, *et seq.* – All Defendants)**

110.    IME WatchDog incorporates by reference each of the foregoing allegations as though fully set forth herein.

111.    The New York customers for whom the IMEs were performed by Defendants were obtained through interstate solicitations by Safa in Texas and scheduled by Safa in Texas, and the observers were paid by Safa and Vito by the transfer of monies from Texas to New York.

112.    As set forth above, Defendants improperly acquired and used Plaintiff's trade secrets, including information regarding Plaintiff's business, operations, services, clients (including annual revenue from particular clients, and client preferences), pricing, sales and marketing strategies, and other confidential business and/or financial information that was secret, valuable in the industry, and had not been disclosed to anyone except Mrs. Levi and Rosenblatt.

113.    The aforementioned documents qualify as "trade secrets" under the DTSA, as defined in 18 U.S.C. § 1839(3).

114.    The misappropriated and improperly used documents concerned Plaintiff's operations, services, clients (including annual revenue from particular clients, and client

preferences), pricing, sales and marketing strategies, including financial, business, and economic information, plans, methods, techniques, procedures, formulas and processes.

115.    Furthermore, Plaintiff has taken reasonable measures to keep such information secret by, among other things, limiting highly sensitive information to Mrs. Levi and Rosenblatt.

116.    The trade secrets misappropriated and used by Defendants include the trade secrets which required substantial resources, time and investment by Plaintiff to create and/or develop, and derive independent economic value from not being generally known to, or readily ascertainably by, those who can obtain economic value from use of this information, such as Plaintiff's competitors.

117.    Defendants' misappropriation and use of Plaintiff's trade secrets has caused Plaintiff to suffer harm, including but not limited to the loss of clients, loss of reputation and customer goodwill, and loss of the confidentiality of, and investment in, its trade secrets.

118.    This harm cannot be adequately remedied at law and requires permanent injunctive relief.  Plaintiff will suffer irreparable and imminent harm in the absence of a permanent injunction; Defendants' continued misappropriation and use of Plaintiff's trade secrets and failure to return Plaintiff's documents containing Trade Secrets will cause Plaintiff further loss of clients, customers, accounts and/or market share.

119.    This imminent injury is neither remote nor speculative, because Plaintiff has already been harmed in precisely this manner by Defendants' misappropriation and use thereof, and will continue to be irreparably harmed in the absence of a permanent injunction.

120.    Defendants will not suffer harm from the rightful return of Plaintiff's proprietary information and trade secrets, and will not be prevented from working.

121.    Defendants will merely be prevented from continuing to gain an unfair and unlawful advantage at Plaintiff's expense.  The ongoing, continuing and future harm to Plaintiff cannot be adequately remedied at law and requires permanent injunctive relief.

122.    The public interest would not be disserved by the issuance of an injunction preventing Defendants from misappropriating and using Plaintiff's Trade Secrets.

123.    Accordingly, Plaintiff is entitled to an injunction, pursuant to 18 U.S.C. 1836(b)(3)(A), enjoining Defendants from continuing to use Plaintiff's trade secrets, in order to prevent continued actual and threatened misappropriation of Plaintiff's trade secrets, and requiring Defendants to return and/or destroy the trade secrets improperly accessed and retained by Defendants, pursuant to 18 U.S.C. 1836(b)(3)(A)(ii).

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
**(Misappropriation – All Defendants)**

124.    IME WatchDog incorporates by reference each of the foregoing allegations as though fully set forth herein.

125.    Defendants' actions, as set forth herein, constitutes misappropriation under New York law.

126.    Defendants currently possess information belonging to and used in the operation of IME WatchDog's business, which information constitutes confidential, proprietary and trade secret information under New York law.

127.    Such information was developed by IME WatchDog through great effort and expense, in terms of manpower, time and costs, and legal fees, and is extremely valuable to IME WatchDog, as it is crucial to the operation of its business, cannot  be easily acquired or duplicated by others, and, if made available to others, would enable them to compete with IME WatchDog to IME WatchDog's detriment.

128.    IME WatchDog makes reasonable efforts to maintain the secrecy of this information including limiting its disclosure to those who, like Rosenblatt, is a corporate officer of IME WatchDog.

129.    The improperly retained information constitute trade secrets and Defendants' actions pose a real and actualized risk that they will and have misappropriated these secrets by using the information to their advantage or for their own personal economic gain and with the willful and malicious intent to injure IME WatchDog's business.

130.    As a result, IME WatchDog has suffered direct and consequential damages, and is entitled to recover compensatory damages, including opportunity costs and punitive damages in anamount to be proven at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Unfair Competition – All Defendants)**

131.    IME WatchDog incorporates by reference each of the foregoing allegations as though fully set forth herein.

132.    As a result of Safa's and Vito's bribery of Rosenblatt to obtain confidential trade secrets, Defendants have in their possession and have used stolen customers from IME WatchDog.

133.    As a result of Defendants' use of the trade secrets stolen by Safa, Vito, and Companions, Defendants have caused economic damages to IME WatchDog along with diminishing its goodwill.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Unjust Enrichment – All Defendants)**

134.    IME WatchDog incorporates by reference each of the foregoing allegations as though fully set forth herein.

135.    Plaintiff has invested substantial time, money, and effort into developing and maintaining its confidential information and trade secrets in promoting and selling its IME observer services, including its customer & client lists, as well as the forms and checklists Mrs. Levi prepared for IME observers to utilize.

136.    Defendants have used and continue to use Plaintiff's confidential information to compete with Plaintiff and funnel Plaintiff's business opportunities away from Plaintiff to Defendants.

137.    As a result of Defendants' use of Plaintiff's confidential information and trade secrets, Defendants have all been enriched at Plaintiff's expense by, among other things, receiving compensation from sales of services through the use of same.

138.    As a consequence of Defendants' use of Plaintiff's trade secrets and confidential information, IME WatchDog has been injured, for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### (Civil Conspiracy – All Defendants)

139.    IME WatchDog incorporates by reference each of the foregoing allegations as though fully set forth herein.

140.    Defendants conspired with each other for an unlawful purpose, to wit: obtaining and using Plaintiff's confidential information to compete with Plaintiff.

141.    Defendants have entered into a civil conspiracy to engage in, *inter alia*, misappropriation, unfair competition, and unjust enrichment.

142.    Defendants each agreed to this common goal.

143.    Defendants acted in concert with the specific object of harming Plaintiff for their own personal gain.

144.    Each Defendant performed an overt act in furtherance of the conspiracy.

145.    The unlawful conduct alleged herein, including acts directed into the State of New York, were committed in furtherance of that conspiracy.

146.    As a result of the Defendants' combined, concerted, and continued efforts, Plaintiff was, is, and continues to be damaged.

147.    As a consequence of Defendants' acts to steal customers of IME WatchDog, IME WatchDog has been injured, for which it is entitled to recover damages including but not limited to financial loss, loss of good will and reputation, compensatory and special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by Defendants' misconduct.

**AS AND FOR A EIGHTH CAUSE OF ACTION**
**(Conversion – All Defendants)**

148.    IME WatchDog incorporates by reference each of the foregoing allegations as though fully set forth herein.

149.    Plaintiff has a possessory right and legal ownership to the confidential information and trade secrets referenced herein.

150.    Defendants exercised unauthorized dominion over Plaintiff's confidential information and trade secrets.

151.    Defendants willfully exercised unauthorized dominion over Plaintiff's confidential information and trade secrets to the detriment of Plaintiff.

152.    Defendants' unauthorized dominion over Plaintiff's confidential information and trade secrets was and is to the exclusion of Plaintiff's rights.

153.     Defendants' unauthorized dominion over Plaintiff's confidential information and trade secrets constitutes conversion.

154.     Defendants have thus committed the tort of conversion under New York common law.

### DEMAND FOR JURY TRIAL

155.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, IME WatchDog hereby demands a trial by jury on all issues so triable in this action.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in its favor as against Defendants as follows:

a.     Compensatory damages for misappropriation of IME WatchDog's goodwill, misappropriation and unfair competition, violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, , unjust enrichment, and civil conspiracy according to proof at trial, including but not limited to, lost profits, disgorgement of compensation received by Defendants, and – to the extent calculable – damages for reputational damage, lost customers, lost relationships, lost revenue, loss of goodwill, corrective advertising, and all other available damages;

b.     Injunctive relief restraining and enjoining Defendants from further violations of the DTSA, including the use of confidential information or trade secrets of Plaintiff, and unfairly competing with Plaintiff in any manner;

c.     Ordering that Defendants return all of IME WatchDog's confidential and proprietary information, including a forensic examination of all of Defendants' computing devices, cellular phones, and cloud storage sites;

d.     Permanently shuttering Direct IME and any related entities and prohibiting the Individual Defendants and their agents from engaging in any similar business, whether directly

or indirectly;

     e.    Punitive and exemplary damages in an amount to be determined at trial in this case;

     f.    Interest (pre-judgment & post-judgment);

     g.    Equitable relief in the form of the imposition of an injunction, constructive trust, accounting, and a disgorgement of profits and other benefits received by reason of the unlawful conduct complained of herein;

     h.    Enjoining Defendants from operating their business by virtue of its illegal conduct;

     i.    Ordering that Defendants pay the costs of suit, including attorneys' fees; and

     j.    Such other and further relief as this Court deems just, equitable, and proper.

Dated: Jamaica, New York
       December 9, 2025

                         Respectfully submitted,

                         **SAGE LEGAL LLC**
                         */s/ Emanuel Kataev, Esq.*
                         Emanuel Kataev, Esq.
                         18211 Jamaica Avenue
                         Jamaica, NY 11042-1073
                         (718) 412-2421 (office)
                         (718) 489-4155 (facsimile)
                         emanuel@sagelegal.nyc

                         **MILMAN LABUDA LAW GROUP PLLC**

                         /s/ Jamie S. Felsen, Esq.
                         3000 Marcus Ave. Suite 3W8
                         Lake Success, NY 11042
                         (516) 328-8899
                         jamiefelsen@mllaborlaw.com

                         *Attorneys for Plaintiff*
                         *IME WatchDog, Inc.*